IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAMS SERVICE GROUP, LLC
as successor to Williams Service
Group, Inc.,

    Plaintiff,

     v.

                             CIVIL ACTION FILE
                             NO. 1:09-CV-832-TWT

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, et al.,

    Defendants.

ORDER

       This is a breach of contract action arising out of insurance policies issued by the

Defendants.  It is before the Court on the Defendants' Motion for Summary Judgment

on Count Three of the Amended Complaint [Doc. 74], the Plaintiff's Motion for

Partial Summary Judgment [Doc. 76], and the Defendants' Motion for Summary

Judgment on Their Counterclaim and Count Two of the Amended Complaint [Doc.

75].  For the reasons set forth below, the Court GRANTS the Defendants' Motion for

Summary Judgment on Count Three of the Amended Complaint [Doc. 74], GRANTS

IN PART and DENIES IN PART the Plaintiff's Motion for Partial Summary

Judgment [Doc. 76], and GRANTS IN PART and DENIES IN PART the Defendants'

Motion for Summary Judgment on Their Counterclaim and Count Two of the Amended Complaint [Doc. 75].

## I. Background

This lawsuit arises out of a series of insurance contracts between Williams Service Group, LLC ("Williams") and four insurance companies (the "Defendants"). Between 1990 and 1997, the Defendants provided more than 45 workers' compensation and general liability policies to Williams. The primary insurance relationship was defined by several agreements: the 1990-1995 policies, and the 1995-1997 policies, along with related schedules, policies, and Large Risk Rating Plan Endorsements (collectively, the "Program Agreements"). The 1990-1995 policies were subject to a $250,000 deductible. The 1995-1997 policies were subject to a $350,000 deductible. Further, under the Program Agreements, Williams was obligated to reimburse the Defendants for premiums, losses, and Allocated Loss Adjusting Expenses ("ALAE")[1] incurred in defending and administering claims.

The policy premiums were adjusted based on the amount of loss actually incurred. These adjustments were calculated pursuant to the Large Risk Rating Plan Endorsements ("LRRPE"). Although the Defendants initially paid the full value of

---

[1]ALAE are defense costs related to claims under the Program Agreements. The Program Agreements set forth several formulas for calculating the percentage of ALAE reimbursable to the Defendants.

all claims, including losses and ALAE, Williams agreed to reimburse the Defendants for all losses up to the deductible amount.  Finally, the Program Agreements required the Defendants to invoice Williams monthly [see Docs. 77-1; 77-2; 77-3; 77-4; 77-5; 77-8; 77-9].

On or about March 31, 1995, Williams and Nation Union Fire Insurance Company of Pittsburgh ("National Union"), acting on behalf of all the Defendants, entered into a buyout agreement (the "Buyout Agreement") [Doc. 77-14].  Under the Buyout Agreement, Williams paid a premium of $3,800,000 and National Union provided coverage for claims up to $4,200,000.  Id.  Williams was required to reimburse the Defendants for payments above the $4,200,000 aggregate limit.  On February 9, 1999, payments under the Buyout Agreement exceeded $4,200,000. (Kessel Dep. at 13; Doc. 77-18.)  The Defendants, however, did not bill Williams for this excess amount until October 2009.

In December 1997, the parties entered into another agreement (the "Collateral Agreement") [see Doc. 77-35].  The Collateral Agreement "detail[ed] the security arrangements for all 'deductible program' or 'note plan' policies of insurance for the years" 1990 through 1997.  Id.  Thus, the Collateral Agreement listed the current collateral securing Williams' obligations under the Program Agreements.  An attachment to the Collateral Agreement provided that AON Risk Services, Inc.

("AON") would periodically review losses to calculate necessary adjustments to the amount of collateral held under the Program Agreements [Doc. 97-9]. The attachment also provided a dispute resolution mechanism if the Defendants disagreed with AON's proposed adjustments.  On April 6, 2009, AON conducted a collateral review and recommended that Williams post $92,202 in collateral [see Doc. 77-38].

Williams filed this suit on March 26, 2009, seeking a declaratory judgment, recoupment, and claims for negligence [Doc. 40].  Specifically, the Plaintiff claims that the Defendants negligently supervised the adjustment of two workers' compensation claims.  Further, Williams claims that it overpaid $548,471 under the 1995-1997 policies.  On April 8, 2009, the parties signed an agreement tolling the statute of limitations on all claims (the "Tolling Agreement") [Doc. 75-6].  The Defendants then counterclaimed [Doc. 58], seeking to recover $1,850,572.26 under the 1990-1995 policies and $166,662.26 under the 1995-1997 policies [Doc. 58]. This amount includes $126,209.98 in claims expense and ALAE that were incurred before, but paid after the March 31 Buyout Agreement.  The Defendants have moved for summary judgment as to their counterclaims as well as Williams' negligent supervision and recoupment claims [Docs. 74 & 75].  The Plaintiff has moved for summary judgment as to the Defendants' counterclaims [Doc. 76].

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Negligent Supervision

Williams claims that the Defendants negligently supervised the administration of Joseph Fahy's and Jimmy Gee's workers' compensation claims [see Doc. 40].  The Defendants argue that the Plaintiff's claims are barred by the statute of limitations. Negligence claims must be filed within two years of the date the claim accrues. O.C.G.A. § 9-3-33.  A negligence claim accrues at "the time when the plaintiff could

first have maintained his action to a successful result." <u>Sandy Springs Toyota v.</u> <u>Classic Cadillac Atlanta Corp.</u>, 269 Ga. App. 470, 471 (2004).

Williams asserts that the Defendants failed to properly investigate Fahy's injury and improperly paid for medical procedures and permanent disability benefits. The Defendants allegedly mishandled Fahy's claim between 1997 and 2003.  Further, the Plaintiff argues that the Defendants settled Gee's claim without authorization.  Gee's claim was settled in 1997.  Thus, if the claims accrued at the time of the Defendants' negligent conduct, Williams' claims are time barred.  Williams argues, however, that the Fahy claim did not accrue until 2009, when the Defendants demanded payment from Williams.[2]

In <u>Gingold v. Allen</u>, 272 Ga. App. 653 (2005), the plaintiff sued for legal malpractice, claiming his attorney's negligent advice resulted in the plaintiff's arrest. The plaintiff argued that the claim had not arisen until he was arrested.  The court, however, held that "a legal malpractice action accrues and the applicable statute of limitation commences to run from the date that the alleged wrongful act breached the attorney-client relationship." <u>Id.</u> at 655.  "[S]ince nominal damages arise upon the commission of the wrongful act, such nominal damages are sufficient as a triggering

---

[2]In its Response to the Defendants' Motion for Summary Judgment, Williams does not dispute that the Gee claim is time barred.  (<u>See</u> Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J; Doc. 98.)

device for the statute of limitation and thus the cause of action then arises." Id. (quoting Hamilton v. Powell, Goldstein, Frazer & Murphy, 167 Ga. App. 411, 414-415 (1983)).

By contrast, in Hoffman v. Insurance Co. of North America, 241 Ga. 328 (1978), the plaintiff sued an insurance agent for negligently failing to obtain adequate coverage. The plaintiff argued that the claim did not accrue until he was sued by a third party. The court ruled that the claim did not accrue until the plaintiff was subjected to liability for which he was not covered. Without the subsequent lawsuit, unrelated to the defendant's negligent conduct, the plaintiff would have suffered no damages.

Here, unlike Hoffman, the Plaintiff was subjected to additional liability at the moment the Defendants negligently paid Fahy's claim. Under the Program Agreements, Williams was required to reimburse the Defendants for losses. This obligation attached as soon as the Defendants paid Fahy's claim. Although Williams did not *actually* pay for the Fahy claim until it was billed in 2009, as in Gingold, the Defendants' wrongful act was directly connected to Williams' damages.[3] Unlike Hoffman, Williams' obligation was not contingent on an intervening event. Although

---

[3]Indeed, Williams has not yet reimbursed the Defendants for this loss. Thus, to the extent that Williams contends its action does not accrue until it has lost money, the Plaintiff's action would not yet have accrued.

the Defendants' demand controlled the timing of Williams' payment, the Defendants' negligence exposed the Plaintiff to increased liability the moment the Defendants negligently paid Fahy's claim.  Thus, Williams' claim accrued, at the latest, in 2003, six years before the Tolling Agreement.  For this reason, the Defendants are entitled to summary judgment on Williams' negligence claims.

  B. <u>Recoupment</u>

  Williams seeks recoupment of $548,471 it claims the Defendants wrongfully charged it under the 1995-1997 policies.  Specifically, the Plaintiff claims that the Defendants were not entitled to reimbursement for ALAE under the general liability policies.  As part of the formula for calculating adjusted premiums, the LRRPE required Williams to reimburse the Defendants for all "Incurred Subject Losses" [<u>see</u> Doc. 97-7 at 1].  "Incurred Subject Losses [includes] . . . all or part of the 'Allocated Loss Adjusting Expenses' [the Defendants] incur in the investigation and defense thereof." <u>Id.</u>  The LRRPE was incorporated into all the 1995-1997 policies, including the general liability policies.  <u>Id.</u> at 5.  Thus, the LRRPE, as incorporated into the 1995-1997 general liability policies, required Williams to reimburse the Defendants for ALAE.

  Nevertheless, Williams argues that the Court should not consider the LRRPE because the Defendants abandoned their claim for unpaid premiums.  Even if the

Defendants do not seek unpaid premiums, however, Williams is not entitled to recoup amounts that it properly paid under the LRRPE.  To the extent that the Plaintiff seeks to recover premiums under the general liability policies, the LRRPE requires Williams to reimburse the Defendants for ALAE.  Thus, the Plaintiff has not shown that it overpaid any amounts under the 1995-1997 general liability polices.

Further, the voluntary payment doctrine precludes recoupment by the Plaintiff. Under the voluntary payment doctrine, "money voluntarily paid may not ordinarily be recovered." Wallis v. B & A Const. Co., 273 Ga. App. 68, 73 (2005) (quoting Emond v. State Farm Mut. Auto. Ins. Co., 175 Ga. App. 548, 550 (1985)).  "[I]f payment was made in ignorance of law, recovery is barred; if in mistake of law, recovery is permitted." Id.  "A mistake of law occurs '[w]here one acts under a mistake of what the law was as applicable to the state of facts, or was requiring.'" Id. Here, Williams claims that it overpaid the Defendants under the general liability policies.  The Plaintiff does not, however, contend that it was unaware of any facts or misapplied any law that caused it to overpay the Defendants. See id. (holding that voluntary payment doctrine barred recoupment where defendant pointed to no mistake of fact or misapplication of law that caused overpayment).  Indeed, the Plaintiff does not specify what mistake caused it to pay the Defendants amounts that were not due. Thus, Williams made the payments "in ignorance–rather than mistake–of the law."

Id.  For this reason, the Plaintiff's claim for recoupment under the 1995-1997 policies is barred by the voluntary payment doctrine.

        C.     Defendants' Counterclaims

The Defendants seek amounts due under the Program Agreements.

        1.     Waiver

First, Williams contends that Defendants waived their right to recover amounts in excess of the aggregate limit of the Buyout Agreement.  Specifically, Williams alleges that Tom Giordano, an agent for AIG, waived the Defendants' right to payment by indicating that the Buyout Agreement was without recourse.  "A waiver may be express, or may be inferred from actions, conduct, or a course of dealing." Kusuma v. Metametrix, Inc., 191 Ga. App. 255, 257 (1989).  To constitute a waiver, however, "all the attendant facts, taken together, must amount to an intentional relinquishment of a known right."  Id.

The Plaintiff's argument is based on a memorandum generated by Williams[4] [see Doc. 77-22].  The message indicates that Tom Giordano "[said] we don't get a statement cause records reflect acct is a buy-out, no need to compute negative interest (sic)."  Id.  Giordano's alleged representation, however, does not constitute an

---

[4]It is unclear who exactly generated this message.  The memorandum is titled "to file" and the subject line "Tom Giordano" [Doc. 77-22].

intentional relinquishment of the Defendants' right to recover under the Buyout Agreement.  Indeed, the memorandum "to file" does not even indicate Giordano's association with the Defendants.  Neither does it specify exactly what he told the Plaintiff.[5]

Further, the Defendants' failure to bill Williams until October 2009 did not constitute a waiver.    The Program Agreements specifically provide that "[f]orbearance, neglect or failure by [the Defendants] or [Williams] to enforce any and all of the provisions of this Agreement or to insist upon strict compliance by the other party shall not be construed as a waiver" [Doc. 97-2].   To the extent that the Defendants continued to insure Williams without demanding payment for amounts in excess of the aggregate limit of the Buyout Agreement, this neglect does not constitute a waiver.  See Ranwal Properties, LLC v. John H. Harland Co., 285 Ga. App. 532, 535 (2007) (finding that delay in making demand for payment does not constitute waiver given non-waiver clause in contract).    For these reasons, the Defendants' counterclaims are not waived.

---

[5]Williams asserts that Giordano indicated that the Buyout Agreement was without recourse and sent several emails to that effect.  The Plaintiff, however, offers no evidence of these communications other than the note cited above.  Notably, this message "to file" was created by Williams, not the Defendants [see Doc. 77-22].

2. <u>Material Breach</u>

Similarly, Williams argues that the Defendants' failure to provide monthly invoices constituted a material breach that excused the Plaintiff's performance under the Program Agreements.  "While any diversion from contractual obligations may be considered a breach, a material breach only occurs when the failure to perform is so fundamental it goes to the root or essence of the contract and defeats its central purpose."  <u>Clower v. Orthalliance, Inc.</u>, 337 F. Supp. 2d 1322, 1333 (N.D. Ga. 2004). While "[a] minor breach of the contract is compensable in damages; a material breach will excuse the non-breaching party from its duty of performance."  <u>Id.</u>  In <u>General Steel, Inc. v. Delta Building Systems, Inc.</u>, 297 Ga. App. 136 (2009), the plaintiff sued to enforce a personal guarantee.  The defendant argued that the plaintiff's failure to provide monthly billings constituted a material breach of the contract.  The court held that the breach was not material, reasoning that "[the plaintiff's] failure to provide billings to [the defendant] on a monthly basis was incidental and subordinate to the main purpose of the guaranty; was not substantial and fundamental so as to defeat the object of the parties in making the contract."  <u>Id.</u> at 141.

Here, as in <u>General Steel</u>, the failure to provide monthly bills was incidental to the main purpose of the contract–providing workers' compensation and general liability insurance.  Nevertheless, the Plaintiff argues that its duty to pay is dependent

on the Defendants' duty to send monthly bills.  The Program Agreements, however, establish no such condition.  Although payment was not due until a demand was made, the duty to pay is not excused simply because demand was not made within 30 days.  As in General Steel, the Defendants' duty to send monthly invoices controlled the timing of payment, not the obligation to pay itself.  For this reason, the Defendants' failure to provide monthly invoices was not a material breach that excused Williams' performance.

### 3.   Statute of Limitations

Next, the Plaintiff argues that the Defendants' counterclaims are barred by the statute of limitations.  Specifically, Williams contends that the aggregate limit of the Buyout Agreement was exceeded on February 9, 1999. The Defendants, however, made no demand until October 2009.[6]  "All actions upon simple contracts in writing shall be brought within six years after the same become due and payable."  O.C.G.A. § 9-3-24.  The cause of action accrues "when the plaintiff could have first maintained the action to a successful result."  Kicklighter v. Woodward, 267 Ga. 157, 159 (1996). The Defendants, however, claim that the cause of action did not accrue until they made a demand for payment in October 2009.

---

[6]The Tolling Agreement tolled the statute of limitations for all claims on April 8, 2009.

In <u>Canal Insurance Co. v. Pro Search</u>, 286 Ga. App. 164 (2007), the plaintiff sued for breach of contract.  The defendant argued that the statute of limitations barred the plaintiff's claim.  The contract in question provided that payment "was not due until 30 days after [the plaintiff] sent notice to [the defendant] of the amount due." <u>Id.</u> at 165.  The court found that the statute of limitations did not begin to run until the plaintiff made a demand, as required by the contract.  The court reasoned that demand must be made within a reasonable time, "but where the parties contemplated a delay in making the demand to some indefinite time in the future, the statutory period for bringing the action is not controlling as to the question of reasonable time." <u>Id.</u> Importantly, the court noted that "the contract did not provide that the demand had to be made at any particular time." <u>Id.</u>; <u>compare</u> <u>Scarboro v. Ralston Purina Co.</u>, 160 Ga. App. 576, 578 (1981) (quoting <u>Teasley v. Bradley</u>, 110 Ga. 497, 511 (1900)) ("In short, to avoid the statute of limitations, the delay in the demand must be contemplated by the contract.").

By contrast, in <u>Bryant v. Allstate Insurance Co.</u>, 254 Ga. 328 (1985), the insured sought retroactive optional insurance coverage after an accident.  The defendant, however, argued that the statute of limitations barred the insured's demand for coverage.  The court held that the statute began to run on the date of the accident, *not* the date the plaintiff made a demand for optional coverage.  The court reasoned

that "[w]ithout some limitation, an insured could delay suit indefinitely before asserting this right to retroactive coverage." Id. at 330; see also Banks v. Aetna Life Ins. Co., 56 Ga. App. 760 (1937) (finding that statute of limitations on claim for insurance benefits began to run when disability arose, reasoning that insured might otherwise "prevent[] the attaching of the statute of limitations to her action indefinitely by the simple expedient of postponing making her proofs of disability and demand for payment.").

Here, like Canal, payment under the Program Agreements was due on demand. Unlike Canal, however, the Program Agreements provided that reimbursement demands had to be made on a monthly basis [see Docs. 77-1; 77-2; 77-3; 77-4; 77-5; 77-8; 77-9]. See Canal, 286 Ga. App. at 165 (finding that statute of limitations began to run at time of demand because "the contract did not provide that the demand had to be made at any particular time."). Thus, although demand was contemplated by the contracts, the delay was not indefinite. Rather, the Program Agreements specifically contemplate a delay of one month. Where the parties negotiate a timetable for making reimbursement demands, the Defendants cannot "prevent[] the attaching of the statute of limitations . . . indefinitely by the simple expedient of postponing . . . demand for payment" in violation of the contract terms. Banks, 56 Ga. App. at 760. "Without some limitation, an insured could delay suit indefinitely before asserting this right to

retroactive coverage." <u>Bryant</u>, 254 Ga. at 330.  The Program Agreements, however, imposed just such a limitation, requiring the Defendants to deliver demands monthly. Thus, at the latest, the Defendants' claims accrued one month after reimbursement expenses exceeded the aggregate limit of the Buyout Agreement in 1999.  For this reason, the Defendants' contract claims are barred by the six year statute of limitations.  <u>See</u> O.C.G.A. § 9-3-24.

The Defendants contend, however, that even if the statute of limitations on their contract claim is expired, they may still draw on the letters of credit posted as collateral.  Specifically, the Defendants argue that "[a]lthough an action to recover a debt may be barred by the statute of limitations, the debt is not extinguished thereby. The limitation laws act only upon remedies and do not extinguish rights."  <u>Sinclair Refining Co. v. Scott</u>, 60 Ga. App. 76 (1939).  Thus, the Defendants assert, even if they are not able to recover under the Program Agreements, their right to draw on the letters of credit is not extinguished.

In <u>Hahn Automotive Warehouse v. American Zurich Insurance Co.</u>, 81 A.D.3d 1331 (N.Y. App. Div. 2011),[7] the insured argued that bills sent by the insurer were

---

[7]The Defendants argue that the letters of credit are governed by New York law. As discussed below, however, the Defendants' right to draw on those letters is governed by the Program Agreements.  Those agreements are governed by Georgia law.  Nevertheless, the Court will address the cases cited by the Defendants.

time barred.  The insurer argued that it was entitled to satisfy the insured's debt using a letter of credit previously issued by the insured.  The court reasoned that the "letter of credit unequivocally permitted [the insurer] to apply the letter of credit to any debts that [the insured] owed to [the insurer]."  Further, "because 'the payment in question [was] already in the creditor[s'] possession as security for a debt . . . , the money already belong[ed] to the creditor[s] and [they were entitled to] apply it to the obligation in any manner' that they chose."  Id. at 1332-1333 (quoting Lines v. Bank of Am. Nat'l Trust & Sav. Assn., 743 F. Supp. 176, 180 n.2 (S.D.N.Y. 1990)).

Here, unlike Hahn, the Defendants' right to draw on the letters of credit arises from the Program Agreements, not the letters of credit themselves.  In Hahn, the court noted that the letter of credit specifically authorized the insurer to apply it to any debt.  Thus, the insurer could rely on the terms of the letter of credit, without reference to the insurance contract.  Even after the right to recover under the contract was extinguished, the letter of credit established an independent remedy apart from the underlying contract.  Here, however, the letters of credit themselves create no such independent remedy.  Contrary to the Defendants' assertions, the letters of credit do not "unequivocally permit[ ] [the Defendants] to apply the letter[s] of credit to any debts that [Williams] owe[s]" [see Doc. 96-1].  Id. at 1332. Indeed, the letters of credit

do not provide that they are security for any of Williams' debts.[8]  Rather, the Program

Agreements establish the Defendants' right *and* the Defendants' remedy.[9]  The

Defendants, therefore, must enforce the Program Agreements to draw on the letters

of credit.  To the extent the Defendants seek to recover amounts paid more than six

years prior to the Tolling Agreement, that remedy is barred by the statute of

limitations.  For this reason, there is no issue of material fact as to amounts paid more

than six years before the Tolling Agreement.

    D.    Amounts Due Within Past Six Years

    The Defendants argue that even if much of their recovery is time barred, they

are still entitled to amounts that have become due within six years of the Tolling

Agreement signed on April 8, 2009.   (Kessel Second Decl. ¶ 13; Doc. 75-4.)

Christopher Kessel, the Accounting Director in the Loss Sensitive Unit of Commercial

Insurance for Defendant AIU Holdings, Inc., testified that the Defendants have

incurred $530,088.58 in losses and ALAE under the Program Agreements within six

years of the Tolling Agreement.  Williams does not dispute these amounts, but claims

_____

    [8]The letters of credit merely provide that the bank will honor drafts issued on the letters of credit [see Doc. 96-1].

    [9]The Program Agreements permit the Defendants to "use or apply this Letter of Credit or any other cash or security it holds from [Williams] . . . to pay any obligation in default to [the Defendants]" [Doc. 97-2].

that the Defendants have offered no legal authority supporting their contention.  (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 17-18.)  As discussed above, however, Williams is obligated to reimburse the Defendants for losses and ALAE under the Program Agreements.  Williams does not respond to the Defendants' statement of undisputed material fact alleging that it owes $530,088.58 [see Doc. 101].  See LR 56.1(B)(2)(a)(2).  Indeed, Williams has presented no evidence creating an issue of material fact as to amounts paid within six years of the Tolling Agreement.  For this reason, the Defendants' Motion for Summary Judgment is granted with respect to the $530,088.58 paid by the Defendants within six years of the Tolling Agreement.

E.      Collateral Reduction

The Plaintiff argues that it should be allowed to reduce its collateral under the Program Agreements to $92,202.  The Collateral Agreement provided for potential downward adjustments in collateral pursuant to a review process.  Under the Collateral Agreement, AON was authorized to conduct periodic reviews of loss history to calculate necessary collateral adjustments.  If AON determined that collateral reduction was warranted, the agreement provided that the collateral amount "shall be adjusted downward" [Doc. 97-9].  The Defendants were, however, entitled to retain an independent actuary to review AON's findings within 20 days of AON's

initial report. Id. In 2009, AON completed a collateral review recommending that the collateral be reduced to $92,202. Williams presented the Defendants with this report on October 29, 2009 [Doc. 77-38]. The Defendants did not dispute AON's report or hire an independent actuary pursuant to the Collateral Agreement.[10] Thus, the collateral "shall be adjusted downward" to $92,202, the amount recommended by AON.

## IV.  Conclusion

For the reasons set forth above, the Court GRANTS the Defendants' Motion for Summary Judgment on Count Three of the Amended Complaint [Doc. 74], GRANTS IN PART and DENIES IN PART the Plaintiff's Motion for Partial Summary Judgment [Doc. 76], and GRANTS IN PART and DENIES IN PART the Defendants' Motion for Summary Judgment on Their Counterclaim and Count Two of the Amended Complaint [Doc. 75].

SO ORDERED, this 17 day of June, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[10]The Defendants claim that AON's analysis does not take into account the 1990-1995 policies. Further, the Defendants claim their own analysis indicates that collateral should be set at $247,000 [see Doc. 97-4, at 87-89].