IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAMS SERVICE GROUP, LLC
as successor to Williams Service
Group, Inc.,

    Plaintiff,

      v.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:09-CV-832-TWT

ORDER

      This is a breach of contract action.  The Plaintiff and the Defendants entered into a series of complex insurance contracts from 1990-1997 under which the Defendants provided workers' compensation and general liability coverage to the Plaintiff.  The policies issued from 1990 to 1995 were governed by one set of agreements while the policies issued from 1995 to 1997 were governed by a different set of agreements.  The question before the Court is whether the Defendants can draw on the collateral posted pursuant to the second set of governing agreements to collect the amounts owed under the first set of governing agreements.

T:\ORDERS\09\Williams Service Group\msj2twt.wpd

I.  Background

The Defendants issued over 45 workers' compensation and general liability policies to the Plaintiff Williams Service Group, LLC, and its predecessor (collectively, "Williams") from 1990 through 1997.  These policies were embodied in annual policy and funding schedules attached to two sets of governing agreements. The first set of agreements governed policies issued from 1990 to 1995 and the second set of agreements governed policies issued from 1995 to 1997.

The governing agreements for the policies issued from 1990 to 1995 were two indemnity agreements (the "1990 Indemnity Agreement" and the "1991 Indemnity Agreement").  (See Pl.'s Mot. for Summ. J., Exs. 8-9).  The Indemnity Agreements required the Plaintiff to reimburse Defendant National Union Fire Insurance Company of Pittsburgh ("National Union") for certain payments made pursuant to workers' compensation claims and for the costs of defending and adjusting claims.  (Id.)  The two Indemnity Agreements were substantially the same, and the 1991 Indemnity Agreement remained in effect through April 1, 1995.  (See id. Exs. 8-9; Ex. 12, Tamblyn Dep. at 144-45).

On March 31, 1995, Williams and National Union entered into a buyout agreement (the "Buyout Agreement").  Under the Buyout Agreement, Williams paid a lump sum $3.8 million premium.  (See id. at Ex. 15).  This premium was intended

to cover Williams' obligations on claims remaining under the policies governed by the Indemnity Agreements. National Union agreed to pay up to $4.2 million under those policies, but once the $4.2 million payout was exceeded, Williams' reimbursement obligations would resume.

On April 1, 1995, the parties entered into the first of the later governing agreements (the "1995 Program Agreement"). (Id. at Ex. 10). This agreement, unlike the Indemnity Agreements, was between the Plaintiff and all the Defendants, not just Defendant National Union. (See id. at Exs. 8, 9, 10). The parties entered into a substantially similar agreement on April 1, 1996 (the "1996 Program Agreement"). (Id. at Ex. 11). The Defendants hold two letters of credit in the amount of $2.2 million posted by Williams as collateral under the Program Agreements (the "Letters of Credit"). ([Doc. 75-4], Kessler Decl. ¶ 4).

Finally, in December 1997, the parties entered into a collateral agreement providing an overview for "the security arrangements for all 'deductible program' or 'note plan' policies of insurance for the years" 1990-1997 (the "Collateral Agreement"). (See Defs.' Mot. for Summ. J., Ex. B). The Collateral Agreement lists the collateral posted for policies issued under the Indemnity Agreements and the collateral posted for policies issued under the Program Agreements. (Id.)

This suit began in March 2009 when Williams sued the Defendant insurers in

state court, alleging claims for negligent supervision and recoupment, and obtained a temporary restraining order preventing the Defendants from drawing on the Letters of Credit issued as collateral pursuant to the 1995 and 1996 Program Agreements. The state court granted the restraining order.  The Defendants removed the case, and this Court lifted the restraining order.  The Defendants then counterclaimed alleging breach of contract and sought to recover $1,850,572.26 in unpaid reimbursement under the 1990-95 policies and $166,662.26 under the 1995-97 policies.  The parties each moved for summary judgment.  The Court denied Williams' motion for summary judgment on the breach of contract counterclaims, granted the Defendants' motion for summary judgment on Williams' negligence and recoupment claims, and granted the Defendants' motion for summary judgment on its breach claim with respect to the $530,088.58 the Defendants paid but were not reimbursed for within six years of the parties' April 2009 tolling agreement.  (See [Doc. 110] at 19).  However, the Court held that the Defendants were time-barred from drawing on the Letters of Credit to collect $1,487,145.94 in unpaid reimbursements.  (Id. at 13-19).   Both parties appealed.  The Eleventh Circuit affirmed the dismissal of Williams' claims but ruled that the Defendants' ability to draw on the Letters of Credit to satisfy the $1,487,145.94 was not time-barred.  See Williams Service Group, LLC v. National Union Fire Ins. Co. of Pittsburgh, No. 11-14999, 495 Fed. Appx. 1, 5 (11th Cir. 2012)

("Drawing on a letter of credit is not an 'action' within the meaning of the Georgia statute of limitations."). The court remanded the case for proceedings consistent with its opinion, and both parties have again moved for summary judgment.

## II.  Motion for Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

The issue in both parties' motions for summary judgment is whether the Defendants can draw on the Letters of Credit posted as collateral for the later Program Agreements to recover for Williams' breach of the earlier Indemnity Agreements. The Defendants contend they are owed $1,850,572.26 for payments made under the

1990-1995 policies and $166,662.26 for payments made under the 1996-1997 policies.  (See Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J., ¶ 13).[1]   This Court previously held that the Defendants were owed $530,088.58 for payments not reimbursed within six years of the tolling agreement, and that holding was affirmed by the Eleventh Circuit.  See [Doc. 110], at 13-19; Williams Service Group, 495 Fed. Appx. at 4-5.  The Defendants seek to draw on the Letters of Credit to obtain the $530,088.58 as well as the remaining $1,487,145.94 owed to them.  The Defendants argue that the specific language of the Indemnity Agreements and the Program Agreements allows them to draw on the Letters of Credit.  Next, they argue that nothing in the Collateral Agreement or the Buyout Agreement indicates the agreements were intended to reduce the Defendants' rights in the event of a breach of the Indemnity Agreements.  Finally, they argue that the Collateral Agreement could not have superseded the previous agreements because it does not cover all of the topics previously agreed to under the Indemnity Agreements

---

[1]Williams denies that it is obligated to reimburse the Defendants the $1,850,527.26.  (See Pl.'s Response to Defs.' Statement of Undisputed Material Facts ¶ 13).  However, Williams' obligation to reimburse the Defendants for this amount is not an issue of fact.  The Court already granted summary judgment to the Defendants on this issue.  The Eleventh Circuit order upholding the grant of summary judgment specifically noted "Williams' $1,850,572 debt for payments of claims under the 1990-1995 policies beyond the [B]uyout [A]greement's $4.2 million cap."  See Williams Service Group, LLC v. National Union Fire Ins. Co. of Pittsburgh, No. 11-14999, 495 Fed. Appx. 1, 5 n.2 (11th Cir. 2012).

or Program Agreements.

The Plaintiff argues that every operative agreement between the parties demonstrates that the Letters of Credit issued pursuant to the Program Agreements do not act as collateral for the policies issued under the Indemnity Agreements. The Plaintiff argues that only it and National Union were parties to the 1991 and 1992 Indemnity Agreements and that only National Union should be able to recover for a default of those agreements. Next, the Plaintiff argues that the Program Agreements represented a "sea change" in the insurance coverage arrangement between the parties. Finally, the Plaintiff argues that National Union paid the losses under the 1996-97 agreements voluntarily, instead of through a claims payment fund, and therefore cannot recover the payments under the voluntary payment doctrine.

A.    The Letters of Credit

This issue is a question of contract interpretation. In Georgia, interpretation of a contract is a matter of law for the Court. O.C.G.A. § 13-2-1. In contract cases, including insurance contract cases, the primary concern is the intent of the parties, and to discover that intent the insurance contract will be construed according to the entirety of its terms. See O.C.G.A. § 13-2-3; Crafter v. State Farm Ins. Co., 251 Ga. App. 642, 644 (2001). Assuming there is but one reasonable interpretation of an

agreement, such will be its meaning.  <u>See</u> O.C.G.A. § 13-2-3; <u>Crafter</u>, 251 Ga. App. at 644.

The contracts at issue are a series of successive agreements.   The first Indemnity Agreement, dated April 1, 1990, laid out an arrangement by which National Union would issue the workers' compensation insurance policies listed in the schedules attached to the agreement.   The agreement stated that it "shall only terminate at such time that all reported claims arising out of the issuance of the Policy(ies) are closed."   (<u>See</u> Pl.'s Mot. for Summ. J., Ex. 8, at Art. X).   The agreement further stated that Williams "shall provide [National Union] at all times with a clean, irrevocable, evergreen Letter of Credit from a bank acceptable to [National Union] or other security as agreed upon hereunder in the amount of the Loss Provision."   (<u>Id.</u> at Art. VIII).   The collateral provision also provided that National Union "may use or apply this Letter of Credit or any other cash security it holds from [Williams] or any affiliate of Williams to pay any obligation in default to [National Union] or in default to any affiliate of [National Union]."   (<u>Id.</u> at Art. VIII). The next Indemnity Agreement, dated April 1991, is substantially the same as the first Indemnity Agreement.   (<u>See</u> Pl.'s Mot. for Summ. J., Ex. 9).   The 1991 Agreement remained in force until April 1, 1995.   (Tamblyn Dep. at 144-45).

In March 1995, the parties entered into the Buyout Agreement.  That agreement, simply labeled "Term Sheet," is an agreement by which the parties consolidated the workers' compensation and general liability policies for the "buyout period" from April 1, 1990 through April 1, 1995.  (See Pl.'s Mot. for Summ. J., Ex. 15).  Under the Buyout Agreement, the Plaintiff paid a $3.8 million premium.  This premium was intended to cover the Plaintiff's obligations on claims remaining under the 1990-1995 policies.  The Defendants agreed to pay up to $4.2 million under those policies, but once the $4.2 million payout was exceeded, the Plaintiff's reimbursement obligations would resume.  National Union refunded the security previously held including letters of credit  not at issue in this motion.  (See id. at Ex. 16, Lanigan Dep. at 87-88).  The Plaintiff argues that the Buyout Agreement exhausted the collateral obligations previously contemplated under the 1990 and 1991 Indemnity Agreements.  Finally, the Buyout Agreement calls for National Union to maintain a notional commutation account consisting of 94% of the buyout premium, interest credit, and the insurer's losses paid to the insured.  The Buyout Agreement does not address security or collateral or identify the Indemnity Agreements specifically.

Soon after the Buyout Agreement, the parties entered into the first Program Agreement, which was made on April 1, 1995.  The agreement governs the parties' rights and obligations with respect to the insurance policies and schedules attached to

the agreement.  The 1995 Program Agreement requires Williams to deliver acceptable collateral to the Defendants at the inception of the agreement.  (See Pl.'s Mot. for Summ. J., Ex. 10, Part II, Art. 3).  With respect to default, the agreement states: "If you [Williams] become in default of any of your obligations under this Agreement or any other similar agreement with us [the Defendants], we may take reasonable steps to protect our interest.  Such steps may include, but not be limited to, the following: [1] Drawing upon, liquidating, or taking ownership of collateral deposited with us to secure your payments under this or any other similar Agreement."  (Id. Part II, Art. 5).  The Program Agreement made on April 1, 1996, includes the same language with respect to collateral and default.  (See Pl.'s Mot. for Summ. J., Ex. 11, Part II, Arts. 4 & 5).

Finally, in December 1997, the parties entered into the Collateral Agreement. (See Defs.' Mot. for Summ. J., Ex. B).   The Collateral Agreement provided an overview for "the security arrangements for all 'deductible program' or 'note plan' policies of insurance for the years" 1990-1997.  (Id.)  For the policy years 1990-1995 – the note policy years – the agreement states that the security is posted pursuant to the National Union Term Sheet agreement attached thereto.  The term sheet attached to the Collateral Agreement is the Buyout Agreement, which calls for National Union to place the $3.8 million premium for the policy years 1990-1995 into an interest

bearing account, notes the $4.2 million aggregate payout limit, and details the process for commuting the agreement.  (See Pl.'s Mot. for Summ. J., Ex. 15).  The Collateral Agreement further states that, for policy years 1995-1997 – the deductible policy years – security is posted as a surety bond for $2,000,000 and a letter of credit for $2.2 million, which includes the $1,000,000 letter of credit posted as collateral for the policies issued from 1996-1997.  (Id.)

Based on all the agreements, the Court concludes the Defendants are permitted to draw on the Letters of Credit issued as collateral in the 1995 and 1996 Program Agreements.  The plain language of the Indemnity Agreements allow the Defendants to draw on the Letters of Credit.  The Indemnity Agreements required Williams to post collateral in the form of a letter of credit and provided that National Union "may use or apply this Letter of Credit or any other cash security it holds from [Williams] or any affiliate of Williams to pay any obligation in default to [National Union] or in default to any affiliate of [National Union]."  (See Pl.'s Mot. for Summ. J., Ex. 8, at Art. VIII).  Similarly, the Program Agreements allow the Defendants to draw on the Letters of Credit.  The Program Agreements state "[i]f you [Williams] become in default of any of your obligations under this Agreement or any other similar agreement with us, we may take reasonable steps to protect our interest.  Such steps may include, but not be limited to, the following: [1] Drawing upon, liquidating, or

taking ownership of collateral deposited with us to secure your payments under this or any other similar Agreement." (Id. Part II, Art. 5). Accordingly, the terms of the Indemnity Agreements and Program Agreements allow the Defendants to draw on the Letters of Credit provided that the Indemnity Agreements and Program Agreements are similar.

Although Williams argues that the Indemnity Agreements represent a completely different arrangement than the arrangement embodied in the Program Agreements, the Court concludes the two arrangements are sufficiently similar to implicate the collateral provisions of both agreements. First, Williams argues that the inclusion of other insurers along with National Union in the Program Agreements renders those agreements different from the Indemnity Agreements. However, the original Indemnity Agreement specifically contemplated the inclusion of future sources of collateral and the future participation of National Union affiliates. It stated that National Union "may use or apply [the] Letter of Credit [posted pursuant to the 1990 Indemnity Agreement] or any other cash security it holds from [Williams] or any affiliate of Williams to pay any obligation in default to [National Union] or in default to any affiliate of [National Union]." (Pl.'s Mot. for Summ. J., Ex. 8, at Art. VIII). National Union currently holds the Letters of Credit posted by Williams for the Program Agreements and is seeking to draw on them to pay Williams' defaulted

obligation to National Union and its affiliates, the other Defendants.  (See Gallagher

Decl. ¶ 8; [Doc. 152-9]).[2] Further, National Union was the contracting party in both

arrangements and is the beneficiary of the Letters of Credit at issue.  (See Pl.'s Mot.

for Summ. J., Exs. 8-11; [Doc. 152-9]).

Next, Williams argues that the technical differences between the governing

agreements render the agreements substantially different.  Instead of a plan for

indemnity and reimbursement of claims paid as outlined in the Indemnity Agreements,

the Program Agreements called for a retrospective premium payment calculated

according to an attached endorsement.  (See Pl.'s Mot. for Summ. J., Ex. 10, at Art.

I).  Additionally, under the Program Agreements, unlike the Indemnity Agreements,

Williams' reimbursement obligations were addressed in the attached policies instead

of the governing agreements themselves.  Finally, Williams argues that the collateral

obligations under the respective governing agreements were different in that the

Program Agreements did not require Williams to execute a promissory note and that

the Program Agreements did not call for collateral to secure "any obligation" but only

---

[2]Williams argues that the Gallagher Declaration offers inadmissible parole
evidence.  (See Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J., at 3-4).  Williams
argues the declaration is inadmissible because Gallagher had no personal knowledge
of the negotiation between the parties.  (Id.)  However, the Court is only citing the
Gallagher Declaration for the evidence that the additional contracting parties to the
Program Agreements were National Union affiliates, not as aid to interpreting the
agreements.

for obligations under the Program Agreements.  Despite the Plaintiff's arguments, the agreements are still substantially similar in that they both provide for workers' compensation and general liability coverage over a period of years identified in attached policies and schedules.   The Defendants note that the changes in reimbursement and premium payment procedures reflected in the Program Agreements concern National Union's accounting and tax practices.  (<u>See</u> Defs.' Reply in Supp. of Defs.' Mot. for Summ. J., Ex. A, Kessel Decl. ¶ 5).  They further argue that all policies issued under both sets of governing agreements were a mix of "deductible program" and "note plan" insurance.  (<u>Id.</u> ¶ 3).  Finally, the Defendants note that under both sets of agreements National Union and its affiliates were required to pay workers' compensation claims and Williams was obligated to reimburse payments past a certain limit.  (<u>Id.</u> ¶ 6).  Accordingly, the Court concludes the Indemnity Agreements are similar to the Program Agreements.

Williams argues that the Buyout Agreement replaced the collateral obligations of the Indemnity Agreements, thus preventing the application of the terms of the Indemnity Agreements.  However, the terms of the Buyout Agreement do not undermine the plain language of the Indemnity Agreements and Program Agreements. The Buyout Agreement is simply a two-page document listing the premium paid for further liability on workers' compensation claims, the limits for each claim, the

aggregate limit, and terms of commutation.  Because there is nothing in the Buyout Agreement addressing collateral or addressing the Indemnity Agreements themselves, the Buyout Agreement did not override any collateral provision in the Indemnity Agreements.  Accordingly, the Buyout Agreement does not represent a contractual intent to forgo the provisions in the Indemnity Agreements allowing National Union to draw on Letters of Credit with respect to the default of "*any similar agreement*." (Pl.'s Mot. for Summ J., Ex. 8, Part II, Art. 5) (emphasis supplied).

Williams also argues that the Collateral Agreement indicates that the Defendants can only draw on the collateral assigned to each set of governing agreements to recover for obligations owed under each respective agreement. However, even assuming the Collateral Agreement's distinction between the collateral for the policies under the Indemnity Agreements and the collateral for the policies under the Program Agreements was enforceable, the distinction does not override the language in the Indemnity Agreements allowing National Union to "use or apply this Letter of Credit or *any other cash security it holds* from [Williams] or any affiliate of Williams to pay *any obligation in default* to [National Union] or in default to any affiliate of [National Union]."  (Indemnity Agreement, Defs.' Ex. A, at 3) (emphasis supplied).  This language permits the Defendants to draw on the collateral explicitly marked as the collateral for the Program Agreements for a breach of the Indemnity

Agreements.  The Collateral Agreement does not change this conclusion.  To the extent Williams is arguing that the Collateral Agreement replaced the obligations and collateral rights of the Indemnity Agreements, Williams' argument fails because the Collateral Agreement and the governing agreements do not cover the same subject matter.  "An existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract."  Wallace v. Bock, 279 Ga. 744, 746 (2005) (quoting Hennessy v. Woodruff, 210 Ga. 742, 744 (1954)).  Here, the Collateral Agreement is much more narrow that the governing agreements.  The Collateral Agreement only addresses collateral obligations while the Indemnity and Program Agreements outline complex reimbursement and payment schemes, as well as collateral obligations.  Accordingly, the Collateral Agreement did not remove the rights and obligations contained in the Program and Indemnity Agreements.

Finally, Williams' argument that "holds" only refers to the collateral National Union held at the time the Indemnity Agreements were executed is unpersuasive.  The relevant passage from the Indemnity Agreements states that National Union "may use or apply [the] Letter of Credit [posted pursuant to the 1990 Indemnity Agreement] or any other cash security it holds from [Williams] or any affiliate of Williams to pay any obligation in default to [National Union] or in default to any affiliate of [National

Union].'' (Pl.'s Mot. for Summ. J., Ex. 8, at Art. VIII). There is no indication, such as the use of the words "currently" or "now," that the term "holds" only refers to collateral that National Union possessed at the time of the contract. The more reasonable interpretation is that National Union may draw on any cash security from Williams it holds when Williams is in default of any obligation to National Union. Accordingly, the Court concludes the Defendants are permitted to draw on the Letters of Credit. The Defendants' motion for summary judgment should be granted in that respect and the Plaintiff's motion for summary judgment should be denied in that respect.

      B.    The Voluntary Payment Doctrine

Williams argues that National Union waived its rights to recover its payments under the 1996-97 policies under the voluntary payment doctrine. "[W]hen a payment is made without a contractual or legal obligation to pay it, the payment is voluntary and the payment cannot be recovered." Southern Mut. Church Ins. Co. v. ARS Mech., LLC, 306 Ga. App. 748, 751-52 (2010) (citing Emergency Professionals of Atlanta, P.C. v. Watson, 288 Ga. App. 473, 475 (2007)); O.C.G.A. § 13-1-13. Williams contends that the payments the Defendants made after exhausting their obligation to pay out $4.2 million under the Buyout Agreement were made voluntarily and without a contractual obligation to do so.

The Defendants, however, contend that Williams' voluntary payment argument is foreclosed by res judicata.  The Court agrees.  Res judicata, or claim preclusion, bars a plaintiff from filing claims that were raised or could have been raised in earlier litigation.  A claim that could have been raised in earlier litigation is barred if: "(1) there is a final judgment on the merits [in the earlier litigation]; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999).  Res judicata can apply to final orders in the same action, and a summary judgment order is a final order.  See Jenkins v. Florida,  931 F.2d 1469, 1472 n.1 (11th Cir. 1991) (applying res judicata based on a previous order in the same action); United States v. One Colt Python .357 Cal. Revolver, 845 F.2d 287, 289 (11th Cir. 1988) (holding that a summary judgment order is a final order).   Here, this Court has granted summary judgment in this case to the Defendants on their claim for breach of the Indemnity Agreements.  (See [Doc. 110]).  By arguing that Defendants' recovery is diminished by the voluntary payment doctrine, Williams is arguing that the Buyout Agreement changed the Defendants' rights to recover under the Indemnity Agreements.  But the Court's prior Order already established the Defendants' rights to recover under the Indemnity Agreements, and Williams did not argue in its prior motion for summary

judgment or opposition to the Defendants' motions for summary judgment that the voluntary payment doctrine should affect the Defendants' rights.  Accordingly, the Plaintiff's argument with respect to the voluntary payment doctrine is barred by res judicata.  The Defendants' motion for summary judgment should be granted.

IV.  Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment [Doc. 147] is GRANTED and the Plaintiff's Motion for Summary Judgment [Doc. 148] is DENIED.  Pursuant to this Court's prior Order, the Defendants are owed $530,088.58.  ([Doc. 110], at 19).  The Defendants are permitted to draw on the Letters of Credit they hold for the $530,088.58, as well as for the remaining $1,487,145.84 balance owed to them.

SO ORDERED, this 19 day of June, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge